IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CARL D. JANUARY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 15-CV-261-PJC |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

# OPINION AND ORDER

Claimant, Carl D. January ("January"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying January's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. [Dkt. 11]. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. January appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred in determining that January was not disabled. For the reasons discussed below, the decision of the Commissioner is AFFIRMED.

## Procedural History

On April 10, 2012, January protectively filed his application for disability insurance benefits alleging an onset date of September 1, 2010. (R. 108-111). The application was denied initially and on reconsideration. (R. 63-67, 71-73). An administrative hearing was held before ALJ Edmund Werre on May 17, 2013. (R. 29-58). The ALJ entered a decision on August 15,

2013, finding January was not disabled within the meaning of the Social Security Act, and therefore not entitled to benefits. (R. 12-24). The Appeals Council denied January's request for review on February 5, 2015. (R. 4-7). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981, *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

### Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[1] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009)

---

[1] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax v. Astrue*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision is supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted). Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall v. Astrue*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence nor substitute its judgment for that of the Commissioner, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.* Even if the court would have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

**Claimant's Background**

January was 46 years old on his alleged disability onset date, September 1, 2010, and he was 49 years old when the ALJ entered his decision on August 15, 2013. (R. 34). On the disability form submitted by January with his application for benefits, January claimed disability due to nerve damage in his arms and neck and high blood pressure. (R. 136). He said he stopped working on September 1, 2010, because he got laid off. *Id.* Regarding daily activities, January reported he: cooks some complete meals, makes sandwiches and sometimes grills; does dishes; mostly sits and watches TV; bathes, feeds and waters pets and takes them for walks; does repairs in the house when needed and mows the yard twice a week. (R. 161-162). He goes shopping for

3

food and house supplies once a week for two to three hours. (R. 163). He socializes with neighbors and friends and goes to church twice a week where he plays bass and sings in the church band. (R. 164). Because of numbness, pain and "not much strength or grip" in his hands and arms, January drops things a lot and finds it hard to reach up or out, especially with any amount of weight in his hands. (R. 160). Pain keeps him from getting comfortable and wakes him up throughout the night. (R. 161). He has problems buttoning shirts and pants, holding a razor at times and cutting meat, holding eating utensils and holding pens or pencils. (R. 161, 165). He has trouble grasping, especially change. (R. 164). And, after mowing, his hands and arms hurt, tingle and sting for about a day. (R. 165).

At the administrative hearing on May 17, 2013, January testified that he was one credit short of qualifying for his high school diploma so he went through the ceremony but did not graduate. (R. 35). January claimed he is unable to work due to: pain and tingling in both shoulders and elbows, inability to lift his arms over his head, gout in his left knee causing pain and weakness, low back pain, and numbness and swelling in his right hand and fingers. (R. 36-51). He testified that he can lift 35 pounds, walk a block, and stand for 45 minutes. (R. 40-42). He said he cannot lift his arms overhead and his hands are weak. (R. 42-43). He testified that he cut a finger on his right hand recently and did not realize it because he could not feel it. (R. 46-48). He said because of numbness, tingling and pain in his hands and arms, he drops dishes, that he cannot hold "big glasses" to drink out of, and that he has trouble buttoning his shorts and holding the razor when he shaves. (R. 48-49). January testified that he underwent two surgeries on his right wrist and hand and one surgery on his left shoulder. (R. 50). He had a spiral fracture in his right leg and "they had to put pins in it." (R. 50-51). The last time he did weed-eating on his lawn, it took him about three and a half hours because he had to stop every thirty minutes

because he could not hold onto it for very long and the vibration "just kills me." (R. 51). He rested about forty minutes until the tingling left. *Id.* January testified that a doctor has recommended neck surgery but also advised that "as long as [he] wasn't in too bad shape" he should wait. (R. 51-52). He said he previously played bass, mandolin, guitar and fiddle with a musical group but had to stop when he had the left arm surgery in 2011. (R. 52). He still plays bass guitar once a week at church. *Id.*

## Medical Evidence

Because January's allegation of error is based upon the ALJ's consideration of the medical evidence as it relates to his right arm impairment, summarization of the medical evidence is limited to the portion of the record that is relevant to that allegation of error, although the entire record has been reviewed.

In conjunction with January's workers' compensation claim for the 2010 injury, January was seen by William R. Gillock, M.D., M.P.H., on November 30, 2010, for an independent medical examination. (R. 189- 195). January gave a history of two surgeries on his right elbow and one surgery on his right hand in the 1990s. (R. 189). He reported he underwent surgical treatment in March 2009 when he tore his right biceps muscle. *Id.* He developed pain in his left hand and arm, tingling in the left ulnar three digits and pain in both shoulders in July 2010 and, after he was laid off in October 2010, he returned to Dr. Chekofsky who recommended further testing. (R. 190). Dr. Gillock noted previous disability ratings by the Workers' Compensation Court for the right arm and right ankle. *Id.* Complaints on the date of Dr. Gillock's examination were: pain in both shoulders, numbness in the right arm, numbness and pain in the left arm, constant ache in both arms, numbness around the right elbow and numbness and tingling in the ring and little fingers of the left hand. (R. 190-191). Dr. Gillock noted three large scars over the

right elbow and a scar in the right palm. (R. 191). January reported pain over the entire left arm. (R. 192). Examination of the left arm revealed no deformities. (R. 192). Sensation and motor function of both arms were normal. (R. 191-192). Range of motion tests were normal and x-rays of both shoulders showed only degenerative changes involving the AC joints. (R. 192-193). Dr. Gillock opined that January's condition or injury was unrelated to his employment, that he required no additional medical treatment related to any work-related injury and that there was no period of temporary total disability or permanent partial impairment from any work-related injury. (R. 194). Dr. Gillock recommended an EMG/NCV (nerve conduction) test of January's left arm for his "non-work related condition." *Id.* He said he found no evidence of injury or impairment to any other body part and that January requires no additional medical treatment, medical maintenance or rehabilitation. (R. 194-195). He found January "has no other periods of TTD (temporary total disability) related to this injury or condition other than those stated herein." (R. 195).

The report by Kenneth R. Trinidad, D.O., dated May 16, 2011, indicates that January demonstrated weakness and decreased range of motion of the right hand. (R. 196-199). Dr. Trinidad reported January had a history of a previous work injury to his right elbow in 2002 with subsequent surgery by Dr. Chekofsky in 2003. (R. 197). January told the doctor that he underwent right ulnar nerve release at the right elbow by Dr. David Wong in 2007. *Id.* In all, January had right carpal tunnel release, right biceps tendon repair, two right elbow surgeries for ulnar nerve decompression and right elbow surgery for epicondylitis and interosseous nerve decompression, in addition to previous right leg surgery. *Id.* Dr. Trinidad reviewed medical records from Dr. Stephen Wilson as well as the Workers' Compensation Court documents related to January's claim for right elbow. *Id.* Dr. Trinidad's impression was "Change-of-

condition for the worse, which has occurred since May 2010 with regard to an April 8, 2009 work related injury to the right elbow that occurred while in the employ of Spatial Solutions, LLC." (R. 198). Dr. Trinidad opined that January required further treatment and evaluation by an orthopedic hand specialist and EMG testing of the right arm. *Id.* He found that January "is not temporarily totally disabled as a result of the right elbow condition." *Id.*

On May 19, 2012, January was examined by Wayland Ron Billings, D.O., on behalf of the agency. (R. 254-259). Dr. Billings recounted January's history of nerve problems in both arms and his complaints of weakness, numbness and frequent dropping of things he tries to hold. (R. 254). Dr. Billings conducted a physical examination during which he noted that January's grip strength was reduced at 1/5 on the right and 3/5 on the left. (R. 255). He assessed residual weakness in upper extremities, right worse than left, after multiple nerve release surgeries. *Id.* On the Range of Motion charts, Dr. Billings noted that January could effectively grasp tools such as a hammer on the left but not on the right. (R. 258).

A physical RFC Assessment form was filled out and signed by Donald Baldwin, M.D., on May 29, 2012. (R. 260-267). Dr. Baldwin found that January can occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk and sit a total of six hours in an 8-hour workday and that his ability to push and/or pull was unlimited. (R. 261). Dr. Baldwin assessed no postural, visual, communicative or environmental limitations. (R. 262-264). However, Dr. Baldwin did find that January's abilities for reaching all directions (including overhead), handling (gross manipulation) and fingering (fine manipulation) were limited. (R. 263). As explanation for his findings, Dr. Baldwin said:

> Clmt is s/p acromioplasty conducted 7/28/11 (Tulsa Bone & Joint).
> 2/29/12 exam (Central States Orthopedic) records that Nerve
> Conduction Study performed reveals no significant compression at

7

> the hand or at the forearm or the elbow. Previous abnormalities from a previous study have normalized indicating excellent decompression of the ulnar nerve at the elbow. CTS left did not respond to injection. Considered full duty as of this date as it related to workers' comp. injury. 3/29/12 visit to Dr. Inhofe who indicate that he clt had residual symptoms in both upper extremities suggestive of cervical radiculopathy. He felt that there was residual partial permanent impairment of the left elbow and left hand.
> FO Observed no difficulties at face to face interview.
> CE: ICE conducted 5/19/12 records vitals of H 6', W 222, BP 158/127, P 90. Best corrected VA OU/OS/OU 20/15. Lungs CTAB, heart RRR, abd had non-obstructive bowel sounds ausculated. Clmt moves all extremities well, peripheral pulses are adequate, able to pick up and manipulate paperclips without difficulty. Clm tis neurologically grossly intact. Grip strength is reduced at 1/5 on the $ and 3/5 on the left. Great toe strength is 5/5 SLR negative bilat in seated and supine positions. Heel/toe walk normal. Gait described as stable at an appropriate speed without the use of assistive devices. Clmt had FROM globally. While clmt was able to grasp tools on the left, he was not able to on the right.
> FUNCTIONAL INFORMATION: ADLS indicate the clmt has difficulties buttoning shirts and pants, and trouble cutting meat. Can prepare meals, including grilling. Assists with repairs and mowing. Walks, drives and rides in a car for transportation. Can go out alone. Shops in stores weekly. Handles finances, as difficulties with dropping change.
> MEDICAL SOURCE STATEMENT: None
> CONCLUSION: Based on the evidence presented, the clmt retains the physical ability to do light work. Clmt should limit handling, reaching, and fingering secondary to residual weakness in hands. (sic)

(R. 267).

Dr. Baldwin's RFC assessment was affirmed as written by Yvonne Post, D.O., on

October 30, 2012. (R. 276).

## Decision of the Administrative Law Judge

In his decision, the ALJ found at Step One, that January has not engaged in any

substantial gainful activity since his alleged onset date of September 1, 2010. (R. 14). At Step

8

Two, the ALJ found that January has a severe impairment of: status post, right upper extremity impairment that causes more than minimal functional limitations and significantly limits January's ability to perform basic work activities. *Id.*

The ALJ found that January's medically determinable impairments of history of: left upper extremity impairment, status post, operations; hypertension; and gout are non-severe." (R. 14). As support for this finding, the ALJ discussed at length the medical evidence relating to January's left upper extremity, gout and hypertension and explained his reasoning for determining these impairments are not severe. (R. 14-17). The ALJ noted that January's treating physicians and surgeons released January with no work restrictions after his left shoulder surgery and subsequent treatment period. (R. 15-16). He noted, however, that January's treating physician found loss of motion of the left shoulder and provided a restriction in the RFC assessment against overhead reaching accordingly. (R. 15). The ALJ gave "great weight" to the opinion of Dr. Billings "regarding his medical finding as he had the opportunity to examine the claimant and offered his opinion based upon the examination signs and findings." (R. 16).

At Step Three, the ALJ found that January's impairments did not meet any Listing. (R. 17). The ALJ found that January has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) with no more than occasional lifting up to twenty pounds; no more than frequent lifting or carrying up to ten pounds; standing/walking six hours out of an eight-hour workday; sitting six hours out of an eight-hour workday; no more than frequent handling, grasping, fingering or feeling with the right, dominant upper extremity and no overhead reaching. (R. 17-18).

The ALJ summarized January's statements in his application papers and at the hearing regarding his activities of daily living as well as the medical evidence regarding January's right

9

upper extremity. (R. 18-22). The ALJ found that the evidence shows that January has undergone three operations on his right elbow, one on his left elbow, two on his right hand, and one on his left shoulder. (R. 18). He noted that in 1995, January had a fracture repaired in his right leg. *Id.* He observed that the last operation was on January's left upper extremity and that he was released from medical care without restrictions in February 2012. *Id.*

With regard to January's complaints of right arm pain, the ALJ noted Dr. Gillock's independent medical evaluation for the Workers' Compensation Court on November 30, 2010, which revealed normal motor function, range of motion and intact sensation with the exception of complaints of pain in the right arm and x-ray evidence of degenerative changes in the acromioclavicular joints of both shoulders. (R. 19). The ALJ also noted Dr. Trinidad's May 16, 2011, opinion that January was not temporarily totally disabled despite his recommendation of further treatment and objective studies. (R. 19). He discussed Dr. Billings' findings that January was neurologically grossly intact except that grip strength on the right was at 1/5 and on the left was 3/5. *Id*. The ALJ noted that Dr. Billings found January had full range of motion globally but that he was unable to grasp tools with his right hand. (R. 19-20). He acknowledged that: "Dr. Billings assessed the claimant with residual weakness in upper extremities, right worse than left after multiple nerve release surgeries and hypertension." (R. 20).

The ALJ then observed that January's daily activities "appear functional with regard to the use of the hands and arms" because he drives a distance of sixty to seventy miles, he uses a weed-eater "which would require grip strength and expose him to significant vibration" and he plays the bass guitar at his church. (R. 20). The ALJ also cited January's testimony that he has had not sought treatment for gout or low back pain which he claims limit his ability to sit, stand and walk and that he does not take medication for pain. *Id.* He again noted that January's

treating physicians released him to full duty without restrictions after his surgeries. *Id.* The ALJ considered other evidence in the record, including January's receipt of unemployment benefits as well as his efforts to obtain employment, which he found weighed in January's favor. *Id.*

The ALJ found January's statements concerning the intensity, persistence and limiting effects of his impairments are not credible to the extent they are inconsistent with the RFC assessment. (R. 21). As support for this conclusion, the ALJ referred to Dr. Gillock's opinion that January had been under no period of temporary total disability and had sustained no permanent partial impairment. *Id.* He also cited Dr. Trinidad's opinion that January was not temporarily totally disabled as a result of the right elbow condition. *Id.* The ALJ noted that neither Dr. Gillock nor Dr. Trinidad offered specific work-related functional limitations other than those statements. *Id.* The ALJ discussed the Workers' Compensation Court's disability determinations and considered them in accordance with 20 C.F.R. 404.1504, which provides that decisions by other agencies are not binding on the Commissioner but are entitled to some weight and must be considered. *See Baca v. Dep't of Health & Human Svs.*, 5 F.3d 476, 480 (10th Cir. 1993). *Id.*

The ALJ gave the "greatest weight" to the opinions of Dr. Baldwin, who completed a physical RFC assessment that included limited handling, reaching and fingering secondary to residual weakness in the hands, and of Dr. Post, who concurred in Dr. Baldwin's assessment. (R. 21, 260-267, 276). He acknowledged that both were non-examining consultants but noted that their opinions were based upon review of all the medical records, including the consultative examinations. *Id.* The ALJ then said this:

> The undersigned has considered the functional evaluation
> assessment of Dr. Billings indicating that the claimant is not able
> to effectively grasp tools such as a hammer with the right hand

11

> given 1/5 grip strength on the right (see Exhibit 6F) however, no
> limitation on the left; and the release of care given by the treating
> physicians with respect to the left upper extremity. The
> undersigned finds the history of left upper extremity impairment,
> status post operations non-severe, and that the above limitations in
> the residual functional capacity finding from the status post, right
> upper extremity impairment are reasonable given the totality of the
> medical evidence.

(R. 22). The ALJ stated that he did not discount all January's complaints but that, given the objective medical evidence in the record, he found January could function within the limitations set forth in the RFC without experiencing significant exacerbation of symptoms. *Id.*

At Step Four, the ALJ determined that January could not return to his past relevant work as bench carpenter, small engine mechanic and medical equipment deliverer. (R. 22). Based upon the testimony of a vocational expert, the ALJ found at Step Five that a significant number of jobs exist in the national economy that January could perform, taking into account his age, education, work experience and RFC. (R. 22). The ALJ thus found that January was not disabled at any time from September 1, 2010, through August 15, 2013, the date of his decision. (R. 27).

## Review

January contends that the ALJ's RFC finding is not based on substantial evidence. [Dkt. 17, at 6]. Specifically, January asserts the ALJ erred by according great weight to the opinion of Dr. Billings while failing to include the limitations imposed by Dr. Billings regarding January's inability to grasp tools such as a hammer with the right hand. *Id.* January claims that the ALJ failed to explain whether or not he rejected Dr. Billings' opinion that January was unable to effectively grasp tools and, if rejected, that he failed to explain why he rejected that opinion. *Id.*

The Commissioner responds that the ALJ did not effectively reject Dr. Billings' grasping limitation but "explicitly did so." [Dkt. 20, at 5]. The Commissioner argues that the ALJ

properly rejected Dr. Billings's grasping limitation in favor of Dr. Baldwin's RFC assessment which limited January to no more than frequent handling, grasping, fingering, or feeling with the right, dominant upper extremity. *Id.*

In his decision, the ALJ thoroughly chronicled the medical evidence, first as it related to January's impairment involving his left upper extremity, and again as it related to his right upper extremity. (R. 14-22). The ALJ stated specific reasons for attributing "great weight" to the opinion of Dr. Billings, who examined January but did not fill out an RFC assessment. *Id.* He also explained his reasons for according "controlling weight" to the "several work releases" by January's treating physicians and surgeons and he cited to the medical evidence that supported those reasons. *Id.* The ALJ then explained that he gave the "greatest weight" to the opinions of Drs. Baldwin and Post because they based their opinions on a review of all the medical records and opinions. (R. 21). Ultimately, the ALJ concluded that the medical evidence shows January has overhead reaching limitations and handling, grasping and fingering limitations and included restrictions in the RFC accordingly.

When faced with conflicting medical evidence, "[t]he trier of fact has the duty to resolve that conflict." *Richardson v. Perales*, 402 U.S. 389, 399 (1971). Here the ALJ did just that. In doing so, he fulfilled his obligation to explain the weight he assigned to each opinion. It is not error for an ALJ to credit a portion of a medical opinion and discount other portions of the opinion. Weighing the evidence is precisely the duty of the ALJ. *White*, 287 F.3d at 905. Where, as here, the ALJ indicates he has considered all the evidence, the court's practice is to take the ALJ at his word. *See Wall v. Astrue,* 561 F.3d 1048, 1070 (10th Cir. 2009).

The RFC is an administrative assessment, based on all of the evidence, of how a claimant's impairments and related symptoms affect his ability to perform work related activities.

*See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at*2; *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2002). Although an ALJ is not an acceptable medical source qualified to render a medical opinion, it is the ALJ, not a physician, who is charged with determining a claimant's RFC from the medical record. *See Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004) (citing 20 C.F.R. § 416.927(e)(2); SSR 96-5p, 1996 WL 374183, at *5.

Contrary to January's argument, the evidence in the record overall does not support his contention that he could perform no grasping at all with his dominant right hand. [Dkt. 17, at 7]. As noted above, January testified that he first injured his right arm in 2009, for which he filed a workers' compensation claim, but that he was working full time as a small engine repair mechanic when he injured his left shoulder in 2010. (R. 35-36). He testified that he re-injured his right arm at about the same time. *Id.* As the ALJ observed, January's testimony and statements regarding his daily activities, including doing odd, mechanic type jobs since 2011, demonstrated that January's limitations are not severe enough to prevent him from participating in substantial gainful activity. (R. 18-22).

Here, the ALJ relied upon the RFC assessment by Dr. Baldwin, concurred by Dr. Post, and all the evidence in the record, including January's testimony and statements as well as his work history, and imposed a restriction against overhead reaching and limitations for handling, grasping and fingering. (R. 17-18). He presented the vocational expert at the hearing with a hypothetical RFC that included limitations of frequent handling, grasping and fingering and was given examples of three jobs that would be available with those limitations. (R. 55-56). In response to a second hypothetical that included more restrictive limitations of occasional handling, grasping and fingering, the vocational expert identified other light and sedentary jobs that would be available. *Id.*

The ALJ's discussion of the evidence and his stated reasons for his conclusions demonstrate that he adequately considered January's alleged impairments. *See Fisher-Ross v. Barnhart*, 431 F.3d 729, 730 (10th Cir. 2005) (evaluating whether the substantial evidence test has been met is based on the ALJ's decision as a whole). The record as a whole contains sufficient evidence that a reasonable mind might accept to support the ALJ's conclusion that January is not disabled. Therefore, the ALJ's decision is based upon substantial evidence in the record.

## Conclusion

Because it is clear that the ALJ considered all the medical evidence in accordance with the regulatory factors for weighing medical opinions, the court finds no reversible error on this basis. Accordingly, the court AFFIRMS the decision of the Commissioner finding January not disabled.

Dated this 14th day of September, 2016.

_____
Paul J. Cleary
United States Magistrate Judge